## Commonwealth v. Schirmer et al.

*Vincent Carroll,* assistant district attorney, for Commonwealth.

GORDON, P. J., March 31, 1938.—The above cases are before us for action on the reports of commissions appointed to inquire into the mental condition of defend-

ants, who have pleaded guilty to the indictments against them. The evidence presented under the pleas was of such a character that we deferred sentence in each case, and requested the prison physician to examine defendants and to take such action, as in his judgment, their mental condition required. After due examination, he presented petitions for commissions under The Mental Health Act of July 11, 1923, P. L. 998, to examine defendants. We appointed Dr. Harold T. Antrim, Dr. Earl D. Bond, and Hon. Harry E. Kalodner, commissioners in the case of Elwood Schirmer, and Dr. Joseph Schenberg, Dr. Charles W. Burr, and William E. Mikell, Esq., in the case of John M. Price. The commissions have filed their reports, and, as the question presented for our determination is the same in each case, we will dispose of both of them in the present opinion.

Each commission finds and reports, in substance, that the defendant examined by it is not insane in the medical or technical meaning of that word, but is mentally ill, and in such condition as to make it necessary that he be cared for in a hospital for mental diseases, and that, if permitted to be at large, he will be a constant menace to the lives and safety of those with whom he may come in contact. In these circumstances, the question is presented whether we have power under The Mental Health Act, supra, to commit defendants to the Farview State Hospital for the criminal insane, and the answer to this question depends upon the correct interpretation to be given to article III, sec. 308, of The Mental Health Act. Before considering the language of the act, however, we will review the facts and finding of the commission in each case.

In the Schirmer case, the commission reports that the defendant "is not medically insane, but is a mental defective and mentally ill, without moral sense, and if permitted to be at large, will, in its opinion, repeat his abnormal criminal conduct, and is in such a condition as to make it imperative that he be cared for in a hospital for mental diseases". At about 3:30 o'clock in the afternoon

of January 5, 1938, defendant noticed the prosecutrix, a stranger to him, walking on Hunting Park Avenue between L and K Streets, in the City of Philadelphia. He immediately experienced a strong desire or impulse to assault her which he claims to have endeavored unsuccessfully to suppress. Under its influence he stalked the prosecutrix for a block or more, the impulse increasing as he followed her. Finally he approached her from behind, forcibly seized her, and attempted to indecently assault her. The prosecutrix resisted the attack, and defendant was apprehended by persons who responded to her screams for help. Defendant's medical and social history discloses that the underlying cause of his criminal conduct is a tainted and degenerate ancestry, and an abnormal personal pathology. He is 23 years of age; one of his parents was the offspring of a brother and sister, was afflicted with a degenerative social disease, became insane when defendant was six years old, and was committed to, and has since remained an inmate of, an insane asylum. Defendant himself displays many of the stigmata of degeneracy associated with such an heredity. He was backward in school, spending most of his time in special classes. His social conduct has been typically abnormal. He has neither desired, nor experienced, normal sexual relations; has habitually and excessively indulged in injurious solitary practices; has neither had, nor sought, male "pals" or companions, and has enjoyed "practically none of the usual social contacts of the normal man of his age and station". On January 26, 1937, he was convicted and sentenced to a year in the House of Correction on a charge of enticing minors for immoral purposes, and, when the offense was committed for which he is now awaiting sentence, he had been at liberty for only a few weeks. Although he admits that he appreciates the nature and character of his criminal impulses, he confesses his inability to control them, and claims that he afterwards bitterly regrets having committed the acts to which he is driven by them.

This outline of defendant's "case history" presents an ominous picture indeed. It is not only a revelation of character and an explanation of his misconduct, but it is also a grim warning, the tragic implications of which cannot be ignored by those upon whom rests the responsibility of protecting society from his depredations. The members of the commission appointed by us were carefully selected for their recognized knowledge and experience in the medical and legal aspects of the field of our investigation. They speak with authority, and their united judgment that Schirmer is technically sane is conclusive of that question. Nevertheless, although he is not insane, he is a social menace, and, to the extent that human reason can forecast the future, it can be confidently predicted that out of Schirmer's disordered mentality there will arise one of those revolting tragedies which of late have all too often terrified and appalled communities, and that, unless means are found to restrain his freedom of action, we are fated to experience in our own midst another sex crime with its attendant ghastly consequences.

The law furnishes the means of preventing such a calamity in The Mental Health Act of 1923, which provides, inter alia, for the commitment of persons detained in prisons to hospitals for mental diseases who are found to be insane, and under it we have the power, in our opinion, to commit this defendant to the Farview State Hospital for the criminal insane, notwithstanding he is not insane in the technical meaning of the word. Section 308 of The Mental Health Act provides:

"When any person detained in any prison, whether waiting trial or undergoing sentence, or detained for any other reason (e. g., as a witness), shall, in the opinion of the . . . jail physician . . . or other responsible person, be insane, or in such condition as to make it necessary that he be cared for in a hospital for mental diseases, the said . . . jail physician . . . shall immediately make application . . . to a law judge of the court

having jurisdiction of the charge against said person, or under whose order he is detained, for commitment of said person to a proper hospital for mental diseases. The said judge shall forthwith order an inquiry . . . by a commission as provided in section three hundred and four of this act, who shall immediately examine the said person and make written report of their findings to the said judge. If, in their opinion, the person so detained is insane, the physicians shall so state in a certificate . . . or the commission in a report. . . . They shall also report whether, in their opinion, such person is of criminal tendency. The said judge may, in his discretion, summon other witnesses and secure further evidence. If he is then satisfied that the person thought or alleged to be insane is in fact insane, he shall order the removal of such person to a hospital for mental diseases. If the prisoner is a convict serving sentence, or if he is of criminal tendency, he shall be removed to a State hospital for insane criminals. In any other case, the judge shall commit him to some other hospital for mental diseases."

This section of The Mental Health Act deals primarily with the commitment of insane criminals and persons of criminal tendency to hospitals for mental diseases. Reading the section literally, it will be observed that, although the petition for the appointment of a commission may be filed whenever, in the opinion of an official of the institution in which the prisoner is confined, he is "insane, or in such condition as to make it necessary that he be cared for in a hospital for mental diseases," the authority of the court to commit to a hospital seems to be limited to cases in which it is satisfied, from the report of the commission and its own inquiry, that the prisoner "is in fact insane". If this be so, we have no choice but to impose a sentence for the crime (the maximum for this particular offense being only one year) and at the end of the term of his imprisonment to turn the defendant loose to pursue his abnormal conduct, until he commits another offense with the same or more serious consequences. This would

be the disastrous result of adopting a narrow and literal interpretation of the act. When, however, this section is read as a part of the general system for dealing with the mentally ill set up by the act as a whole, and in the light of all its provisions, including the definitions contained in section 103, it becomes manifest that the word "insane", as used in section 308 dealing with criminals and persons of criminal tendency, has a more comprehensive and broader meaning, and embraces not only the technically insane, but also those whose mental illness is of such a character as to render their confinement in a mental hospital necessary for their own protection and that of others.

There are ample provisions in the other sections of the act by which relatives, guardians and even friends, of mentally ill persons who need hospital care, whether or not they be technically insane, may have them committed to proper institutions for care and treatment. The case of the mentally ill criminal, however, or person of criminal tendency, who is confined in prison and who must ultimately be released, is covered, if at all, only by the section of the act here under consideration. To hold, therefore, that such persons, if not technically insane, are not within the scope of the section, would set at liberty, after short periods of incarceration, those whose mental illness is peculiarly dangerous and threatening to the lives and safety of others. It would protect society from the harmless dement, and at the same time expose it to the menace of the dangerous psychopath.

It is not conceivable that such was the intention of the legislature, and it is the duty of the courts, as was said by Mr. Justice Stern in the case of Simmler v. Philadelphia, 329 Pa. 197, "in all cases of statutory construction, to seek the general design of the statute, and, so far as judicially possible, to render it practically effective in accordance therewith." Bearing this principle of interpretation in mind, we think that the word "insane" includes all cases of the mentally ill who may reasonably

be said to require institutional care and restraint. Section 103 of The Mental Health Act provides:

"As used in this act . . . 'insane criminal' shall mean any person mentally ill who has been convicted on a criminal charge and the period of whose sentence has not expired, or who has a criminal tendency."

And in the same section it is provided:

" 'Mental illness,' 'mental disease,' 'mental disorder' shall mean an illness which so lessens the capacity of the person to use his customary self-control, judgment, and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under treatment, care, supervision, guidance, or control. The terms shall be construed to include 'lunacy,' 'unsoundness of mind,' and 'insanity.' "

Reading these two definitions together, "insane", when used in the act in connection with criminals, has a much broader significance than that usually given to it, and includes mental maladies which do not fall within the strict connotation of insanity. Hence when the act, in authorizing a petition for a commission to be presented as to prisoners, uses the words "insane, or in such condition as to make it necessary that he be cared for in a hospital for mental diseases", the second clause is merely descriptive of the first, and not disjunctive, and the power given to the court to commit to a hospital for mental diseases those whom it is satisfied are "in fact insane" includes the mentally ill who need hospital care but are not actually insane. No other interpretation of the section will give effect to the legislative intent as clearly manifested in The Mental Health Act as a whole.

In the case of Commonwealth v. Price, the commission appointed by us reports that they find "the said John M. Price is not in fact insane, but is a mental defective; mentally ill; without moral sense, and will continue criminal conduct if allowed to be at large". Price pleaded guilty on January 6, 1938, to a charge of aggravated as-

sault and battery on his brother. He had become angry at his mother, and was berating her, when his brother and father intervened and sought to persuade him to desist. His anger was then turned against his brother and a fight ensued, in which Price acted with extreme excitement and violence, seized a knife, threatened to kill all his relatives, and stabbed his brother in the shoulder, inflicting a minor wound. Price comes of an apparently respectable family of colored people. It was testified, however, that he is subject to unreasonable and ungovernable "spells" of anger, during which he is transported beyond all self-control. This condition has existed for a considerable time and has been recognized by his family, who describe his seizures as "spells". On one or two previous occasions, he attempted to set the house on fire, while his family was asleep, with the avowed purpose of burning them to death. No prosecution resulted from these acts, however, and this appears to be the first time that he has been before a court for sentence. We are advised by our commission that defendant recognizes his condition, and admits his previous attempts at arson with homicidal purpose. He has repeatedly, on utterly inadequate provocation, become transported with rage, and endeavored to kill those against whom his anger has been directed. Here also is murder in the making, imposing a grave responsibility upon those who realize his condition and can avert a future tragedy by decisive action. We cannot fail to act upon the warnings disclosed by these facts.

It is not necessary to repeat the reasons we have already stated for reaching the conclusion that we have power to commit this prisoner to the Farview State Hospital for the criminal insane. Although not medically insane, his case clearly falls within the meaning of the word as used in section 308 of The Mental Health Act, and for his own protection, as well as of those who are likely to become the victims of his uncontrollable passions, we believe it our plain duty to place him under the care and re-

straint of a hospital adequately equipped to handle such cases.

In each of these cases, the character of the prisoner's mental affliction impels him to the commission of criminal acts. In the Schirmer case, the present conviction is not his first. In the Price case, although now for the first time convicted, the prisoner's present crime is neither the first, nor the least, of his criminal acts. The State has provided a special hospital, adequately equipped to care for the criminal insane, and the act requires us to commit to such a hospital, if the person is a "convict serving sentence, or if he is of criminal tendency." Mental cases of this character are a special and peculiar menace to society as a whole, and require the special care and control of an institution such as the Farview State Hospital.

For the foregoing reasons, the reports of the commissions in each of the cases here under consideration are approved, and an order will be made committing the prisoners to the Farview State Hospital for the criminal insane.